MEMORANDUM OF DECISION RE MOTION FOR TRANSFER OF GUARDIANSHIP
On June 19, 1998, Tammy C. filed a motion to reopen and transfer guardianship of her son, Alexander C., now age six, from his maternal grandparents, Paul and Joan C., to herself. On November 20, 1992, Alexander, then four months old, was removed from Tammy's care by the Department of Children and Families, hereafter "DCF", and placed into foster care. His removal was due to Tammy's drug and alcohol abuse and the fact that she left her infant for substantial periods of time with an unrelated casual acquaintance. Alexander was adjudicated a neglected child on April 13, 1993 and his guardianship was transferred to his maternal grandparents who have provided his daily care since that time. Tammy has had contact with her son through the years, initially informally as permitted by her parents, and, since 1995, by court order.
On April 14, 1995, by stipulation and court order, visitation was permitted, once a week for one hour and supervised. After one brief unsupervised visitation session and then an altercation with her father in March, 1995, which ended in Tammy's arrest, further court assistance was sought by both Tammy and her parents. Visitation since then has continued, with breaks in time and difficulties concerning locations and supervisors, on that weekly schedule. Tammy has, on several occasions, returned to court to seek additional visitation and visitation under different conditions.
The present motion to reopen and transfer guardianship was filed on June 19, 1998 and assigned for hearing at the Child Protection Session. A subsequent motion for unsupervised visitation was also filed by Tammy. The court heard five days of testimony from the grandparents, Tammy C. and twelve other witnesses, and received twenty-nine exhibits. After four days of hearings in September, the fifth day was scheduled for November CT Page 13699 16, 1998, at which time the hearing concluded. From that testimony and evidence, the court finds, by a fair preponderance of the evidence, that Tammy C. has rehabilitated herself and has met all of the expectations set for her and ordered by the court (Driscoll, J.) on November 11, 1997. Since that time she has visited with Alex as often as permitted, has participated and completed an intensive, hands-on parenting education program with Alexander, has continued with individual therapy, has maintained adequate housing and income, has not engaged in any substance abuse and has had no further contact with the criminal justice system.
Tammy's life since 1995 demonstrates a steadily accelerating pattern of addressing the issues of her drug and alcohol addiction and her own significant psychological and emotional issues. She has become financially self-sufficient after receiving training to become a nurse's aide and has steady employment in a nursing home. In these last three years, Tammy has continually confronted significant matters in her life and become a fully functioning, independent and sober young adult. The evidence is that Tammy has been sober for four years and regularly attends Alcoholics Anonymous and other twelve step program meetings. There is no evidence of her drug and alcohol addiction, the severity of which in 1992 caused her to both be unable to care for herself and her infant son.
Tammy is today a twenty-four year old young woman who has overcome a turbulent childhood, during which she herself became a foster child, had multiple placements and finally came at age eight to live with and then be adopted together with her brother by Paul and Joan C. By the time Tammy was fourteen, she could not be controlled and maintained in the home and began a four year stay in various residential placements, as well as requiring five psychiatric hospitalizations. The conflicts between Tammy and her parents, which exploded in those years, have never been resolved. When Tammy turned eighteen, her risk-taking and acting out continued. She became pregnant with Alexander, who was born on July 29, 1992 when she was eighteen and a half years old. At that time, she had only sporadic income, multiple and at times casual living arrangements, and continued drug and alcohol use.
Tammy, in 1992 and 1993, knew and admitted to DCF and her parents that she could not care for Alex. Her parents stepped in, first as specially licensed foster parents when Alex was placed with them in January of 1993. Joan C. testified that she and her CT Page 13700 husband accepted guardianship of Alex to make sure that Alex would not remain a foster child himself and become lost to his family of origin. Since 1993, Paul and Joan C. have provided Alex with the stability, nurturing and care he required.
By 1995, however, Tammy began to take steps legally to seek the return of her child. On July 2, 1995, Dr. Robert Meier conducted a court-ordered psychological assessment of Tammy and Alex and both grandparents. He concluded that Tammy had not yet begun the necessary internal changes to be able to care for Alex. He testified that at that time Tammy "was suffering from serious emotional distress, symptoms of depression and significant conduct problems and that there had been substance abuse." He recommended continued supervised visits, with a neutral supervisor and Tammy's participation in psychotherapy as well as outpatient drug counseling. He concluded "She is clearly in need of guidance with regard to her consistent treatment and sensitivity to the needs of Alexander."[2]
By 1997, however, Dr. Meier's conclusions about Tammy had changed. On September 10, 1997, he again evaluated Tammy and Alexander and received some written information from the grandparents. He testified that the test results changed dramatically. He noted "that there was a more concerted effort in redeveloping a strong relationship with her son." After observing Alex with his mother, he noted in his report:
 "Despite there having been little contact with mother, Alex seemed to be quite content with her. He was not overly spontaneous, but this would not be expected. Mother's interaction with the child was very good. She was attentive, but did not pressure the child to move faster into the relationship that was comfortable."
He concluded in his report that:
 "Mother's relationship with her adoptive family is highly strained at this time. While the hope at the time of the last evaluation was that the problems could be resolved within the family, and could move toward reunification, this has obviously not been possible."
Another assessment was provided by Dr. Michael D. Pines, a psychologist with whom the grandparents had consulted in their care of Alex and who had seen Alex on a monthly basis for CT Page 13701 approximately six months prior to the commencement of this hearing. Dr. Pines prepared a report in 1997 in which he stated that his observations of Alex with his grandparents suggested that the child had an anxious, insecure attachment problem. He recommended at that time that if Tammy could consistently visit Alex in a supervised setting for six months and do so consistently, that he would recommend trial unsupervised visits, an opinion consistent with Dr. Meier's court-ordered evaluation.
At trial, Dr. Pines testified that in his opinion, Tammy had not visited consistently in the interim and, based on his contact with the family, did not believe it to be in the child's best interest to be returned to his mother. When speaking about the attachment disorder Alexander suffered and what kind of work would need to be done to foster an attachment by Alex to his mother, he stated:
 "First and foremost, there would have to be a working relationship between the adult parties, to support each other in that plan. It would be essential for the mother to have stability in her life and to have an understanding of the impact of such a move on this child and what difficulties such a move might present to the child and to have an incredible amount of patience."
After yet another court motion, in November, 1997, supervised visitation together with parenting education was ordered by the court and Tammy and Alexander were placed on a waiting list for the Smith-Bent program run by the Child and Family Agency of Southeastern Connecticut in New London. And in early March, 1998, Tammy and Alex began to meet weekly in this supervised setting, which included parenting education for Tammy, a weekly one hour supervised visit with Alexander and discussions with the supervisor after each session about the events of the session with suggestions for improvement and the demonstration of effective parenting techniques. Tammy and Alexander completed this six month program, which was a success based on the evaluation performed by the agency and a review of the records[3] Tammy missed very few visits and took instruction well. Joan Dignoti, a community worker in the visitation program at Smith-Bent testified. She noted that the program is offered pursuant to a contract with DCF to provide hands-on parenting education and training as well as supervised visitation. It is six months in duration for each participant and child. She described the initial session, when Alex exhibited some fear of CT Page 13702 his mother. "As the time went on, Alexander was more relaxed," she stated, "and had established a relationship with his mother." She also spoke of a session when Alex was crying and she responded to him. She stated that Tammy spoke "soothingly to the child, who nestled in her embrace and stopped crying."
Dr. Meier, who completed a third update of his evaluation during the pendency of the continued hearing, also received and reviewed the material from Smith-Bent, which he found helpful. He concluded in his report of November 12, 1998:
 "Of concern is the delay in implementing recommendations, not only by Dr. Pines, but by this evaluator over the past two years. While guidelines suggest a child should be in a temporary placement situation for a limited period of time if the parent shows little progress in rehabilitation, this does not seem to be the case here. Mother was showing significant progress over a year ago, and has apparently continued to do so. The delay in returning this child to her care, and the many expectations placed upon her in order to demonstrate her effectiveness as a parent, is beyond what this evaluator has seen in most cases."[4]
In addition to the support evidenced by the psychological evaluations, DCF prepared a Social Study for Revocation of Guardianship, which was received by the court on November 21, 1997 and recommended reunification efforts to begin with "weekly supervised visitation in a neutral setting where Ms. C. and the minor child can bond and rebuild their relationship. If supervised visits are successful, unsupervised day visits should follow, and then weekend overnight visits."
An assessment of the situation, a guardianship study, was also performed on behalf of the grandparents by Lutheran Social Services.[5] Ms. Couglin of the Agency testified that her report had been prepared under time pressure and that she did not meet with Tammy or speak with the child's attorney or with DCF about this matter. She admitted that her study was not a complete study of the type the agency often prepares. She stated that when she arrived at the C. home in September 1998, to conduct the in home portion of the investigation, Alexander was withdrawn and afraid. He was clinging to his grandfather and was crying. Alexander spoke of being taken away. She testified that she assured him she was not going to take him away and he calmed down. Given the nature of the study she conducted, it is natural that she supported the grandparents. In response to questioning, CT Page 13703 however, she did state during her testimony that in order to increase Alex's bond with his mother, "Alex would need to spend more time with his mother not in an artificial setting, in a more nurturing setting for both of them."
Alexander's reaction is also not unusual, given his awareness of the relationship between his grandparents and his mother. As Dr. Meier testified, "there were many messages given by the mother and the grandparents about how they felt about each other. Alex is in the middle of it." Not all of those messages are direct, verbal messages, but are reflected in the ways in which the grandparents resist the contact Tammy desires with her son.
Unfortunately for Tammy, her parents have been unable to hear the conclusions from the experts and unwilling to accept the evidence of their daughter's growth and maturity. They have never been supportive of more contact between Tammy and Alexander, particularly unsupervised contact. From their testimony, the court concludes that they are not in support of such contact today. The conflict between Tammy and her parents was noted by Dr. Meier in 1995 when he recommended an independent monitor for visitation. In 1997, in his report, he reviewed the letter sent to him by Paul C. concerning Tammy and the relationship between herself and the child. He found that the document read more like an indictment of Tammy, rather than "being an attempt to improve communication or move toward resolution of the problems." The continued insistence on supervised visitation has been problematic for Tammy and the frequent lapses in visitation were all seen, in particular by her father, Paul, as evidence of her continued unfitness to parent Alex. In Tammy's search for herself and her place in society, it understandable that it would be hard for her to face her accusing and judgmental parents, whose standards she did not and could not meet. And the sad fact remains that when both Paul and Joan testified at the hearing, each admitted that they did not believe their daughter could parent Alex and that there was nothing she could do to change their perception of her failure as a parent.
This case began with an order of temporary custody, then continued with an adjudication for neglect and ended, not with commitment of Alex to DCF, but with a transfer of guardianship to his grandparents, a result which would ordinarily lead to a family resolution of the issues without continued court intervention and supervision. Tammy herself testified that in 1993 she thought this was the best procedure and spoke of her CT Page 13704 hopes and her faith at that time that the family could resolve this matter. Today, with hindsight, it is clear the case has not proceeded as expected, for if Alex had been committed to DCF, he would have been reunited with his mother long since, based on the evidence and proof of Tammy's rehabilitation. But Tammy's parents cannot see her growth and maturity through unbiased eyes and see instead their flawed daughter, with whom they have had extreme and excruciating problems in the past. They still view her as in need of their correction and instruction. Tammy, in the eyes of her parents, cannot do anything to achieve their required goals and everything she has done so far is not enough. Her occasional lapses in judgment while in their presence, her confusion and her inability to regularly visit when that included coping with her parents have not been accepted by them with love and understanding, but with judgmental scrutiny catalogued exhaustively in the need to justify their continued rejection of her and their perceived need to protect their grandson.[6]
Perhaps in 1993, 1994 and 1995, when caring for the infant, toddler and the preschooler that Alex was, Paul and Joan C. did not imagine that Tammy could change, certainly not to complete the life changes necessary to accommodate the care of Alex. In the interim, they, too, made many significant changes to their lives to accommodate his care, which included Paul's retirement and Joan's decision to work part-time. There is no question that both have been dedicated to the child's welfare, at times excessively so. Sadly, what is clear from observing the parties in court now, is that their estrangement from their daughter and her from them continues without change, visible in the manner in which they avoid eye contact and audible, as they struggle to testify about what is in their minds, without fully revealing the bitterness each possesses. Tammy's unstated bitterness is expressed in her understanding of her parents' unwillingness to see her as a mature young adult, putting past mistakes behind her and making amends where and however she can. And Paul and Joan's hardened disappointment and anger at their daughter is visible, as they appear to still see the adolescent who caused them great grief and pain and prevented the vision they had of their family from coming into being. To the credit of all three, they each made considerable efforts to tone down those feelings and to testify in a balanced and muted manner about each other, but were successful only to a limited degree.
But Tammy's past mistakes and her parents' disappointment in their daughter's life choices are not an adequate or permissible CT Page 13705 basis for removing her son from her care for his entire minority. The issue in this revocation hearing is whether or not a cause for such "commitment" or transfer of guardianship still exists. (In re Juvenile Appeal (85-BC), 195 Conn. 344, 488 A.2d 790
(1985). As was stated In re Thomas L., 4 Conn. App. 56, 57,492 A.2d 229 (1985):
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that cause for commitment no longer exists. Once that has been established, the inquiry becomes whether a continuation of the commitment will nevertheless serve the child's best interests. On this point, when it is the natural parents who have moved to revoke commitment, the state must prove that it would not be in the best interests of the child to be returned to his or her natural parents." (Internal citations omitted).
The court concludes, by a fair preponderance of the evidence, that Tammy has shown that there is no longer a cause for the commitment of Alexander today.
The next inquiry, then, is what is in Alexander's best interest. As was stated in In re Jessica M, 217 Conn. 459, 475,586 A.2d 597 (1991):
 "Although a `best interests of the child' analysis is irrelevant in determining whether an `ongoing parent-child relationship' exists, it is relevant, and perhaps dispositive, in matters of visitation; . . . and in any proceeding to transfer guardianship", quoting In re Juvenile Appeal (Anonymous) 177 Conn. 648, 420 A.2d 875 (1979).
And in the context of that inquiry, do Paul and Joan C., as the parties opposing the motion to transfer guardianship, need to prove that it would be detrimental to return Alexander to his mother? The case law does not answer this question directly. What is evident is that anyone who does not have the primary and daily care of a child would be hard pressed to prove it was in that child's best interests to be with the person, who is not the child's primary caretaker. Placing the burden on the caretakers to show that it would be detrimental to return the child redresses that imbalance. In thus weighing the interests of the child with a parent's entitlement to the society of that child, it would seem that the shift in the burden should take place even when it is not the State opposing the return of the child, but CT Page 13706 the guardians themselves. The same shift in the burden of proof, established in the case law in the revocation arena, is recognized as a presumption in Connecticut General Statutes46b-56b, which states that:
 "In any dispute as to the custody of a minor child involving a parent and a non-parent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."
From the case law and the statutes, the court notes that in a neglect disposition, guardians form one of the groups of people to whom the care of a child may be entrusted pursuant to the statute, as well as the state itself. It is therefore logical that at the end of the process, requiring the guardians to have the same burden of proof as the State itself, when such guardians oppose the return of a child, is appropriate. It should not matter in this context which of the available statutory choices the court took to protect the child. And it should also not matter that, when there is a motion to revoke that commitment, who is opposing it, the State or the guardianship. The court therefore holds that the same standard applies to the guardians opposing the transfer of guardianship as if they were the State itself. And so the burden of proof has shifted to Paul and Joan C. to show that a transfer of guardianship of Alex to his mother would be detrimental to him.
Given the testimony of Dr. Meier and the evidence of the increasingly appropriate relationship between mother and son when permitted to visit regularly in an appropriate, conducive and supportive setting, that burden of proof has not been met in this hearing. From the evidence to date, Tammy has demonstrated the commitment, skills and understanding to become a full-time parent to Alexander in the near future. The court concludes, however, that without the increasing and unsupervised visitation recommended by DCF and Dr. Meier, it is premature to return guardianship of Alexander to his mother, although the legal predicates to such return have been proven. The court further concludes that the reunification steps as recommended by DCF and Dr. Meier need to be implemented. The court therefore will grant the motion for unsupervised visitation and enter the following interim orders, retain jurisdiction over the matter and continue the hearing on the motion to revoke the guardianship until March CT Page 13707 1, 1999 for final disposition. At that time, the court will hear the parties further and expect to receive a detailed plan for Alex's transition into his mother's home and a plan for liberal and sustained contact with his grandparents.
In the implementation of these orders, the court directs the parties to heed Dr. Pines' testimony: "First and foremost, there would have to be a working relationship between the adult parties, to support each other in that plan." Dr. Meier also stated that the process by which Alex is allowed to develop his relationship with his mother will make a major difference and that the "ideal situation would be if they could resolve some of their differences so that (Alex) can enjoy both his mother and his grandparents." Toward that end, the court directs the grandparents and Tammy to set aside their differences and to work together for the benefit of Alexander and his future. And in particular, the court directs Paul and Joan C. to encourage their daughter's contact with her son, by word and deed. The court further directs Tammy to be supportive of her parents' considerable and ongoing efforts on behalf of Alexander.
 INTERIM ORDERS 1. Commencing on December 1, 1998 and for all Wednesdays during Alexander's normal school attendance thereafter when she is able to exercise it, Tammy shall have unsupervised visitation with Alex at a convenient time after school for supper and until within 45 minutes of his bedtime; such unsupervised visitation to take place in Windham and the surrounding areas, as the drive to New London is too time-consuming for the child.
 2. Beginning December 12 and for the weekends of December 19 and December 26, Tammy shall have unsupervised visitation with Alexander from 10 A.M. on Saturday to 5 P.M. on Saturday. Paul and/or Joan are directed to transport Alex to a neutral location in New London where Tammy shall meet them. Tammy shall return Alexander to her parents' home by 5 P.M.
 3. Commencing on Saturday, January 2, 1999, Tammy shall have unsupervised visitation with Alexander from 10 A.M. on Saturday to Sunday at 5 P.M., and such visitation shall continue on alternating weekends with the same transportation arrangements set forth above.
 4. In addition to the weekly Wednesday visits and the alternating CT Page 13708 weekend visits, Tammy shall be entitled to have Alexander in her home during Alexander's winter school vacation.
 5. Further, the court directs that Tammy shall have telephone contact with Alexander twice a week. The court finds that it is not acceptable for Paul C. to permit the child to refuse to speak to his mother on the telephone. The court suggests that Joan and Paul C. spend time after school with Alexander reviewing the highlights of each day and discussing with him those things he might wish to tell his mother. They are further directed to set aside time after dinner twice during the school week when they will encourage and support him in not only speaking with his mother briefly, but in having conversations with her. Further, the grandparents are to provide Tammy with information about his school schedule, sports activities, if any, now that soccer season is ended, the name of his pediatrician and other health care providers. In addition, during the weekends when Tammy has Alexander in her care, he is to have telephone contact with his grandparents and that contact is to be supported by Tammy in the manner outlined for the grandparents. Tammy should also provide her parents with her telephone number and other relevant information concerning Alex while in her care.
 6. As the witnesses have observed, Alexander is sensitive to the unstated emotions and attitudes of those around him. In an effort to keep such emotional messages to a minimum and as neutral as possible, the court directs that his grandparents not explain the changes in the schedule to him, but that any such explanations be handled in conjunction with the advice and input of Dr. Pines. Further, Tammy is also directed not to discuss this matter and the eventual expected return of Alexander to her care with Alexander directly. As Dr. Meier has indicated ongoing family therapy would be of benefit to the family, the court directs that Tammy secure child-focused therapy for herself and Alexander in her area of residence, either with the Child Guidance Clinic, Child and Family Agency or some other suitable organization. It would be beneficial if those professionals were permitted to have contact with Dr. Pines, and the court directs that such contact be permitted. Such professionals will then be in a position to assist both Tammy and Alexander in any transitions that may be ordered. The court further directs that once this therapy has been put in place, that Paul and Joan C. be involved as needed. While such therapy does not address the problems that exist between the adults, it should facilitate the various issues that arise with Alexander's care in the interim. It is the court's suggestion that if the adults are CT Page 13709 willing, they also explore therapeutic ways in which their conflicts might be professionally addressed.
 7. The court further orders that Dr. Meier perform one last update of his evaluation in this case prior to the court hearing now scheduled for March 1, 1998. His evaluation should look at the parent-child interaction, in particular as it relates to the return of Alex to the full time care of his mother, and what additional steps or supports, if any, may be required for the benefit of the child.
 8. The court further directs that a copy of this decision be provided to the professionals involved with the child by Attorney Richard Dixon and that Dr. Meier's reports also be made available to them.
 9. The court furthers states that the foregoing are the minimal orders of contact and that, to the extent the parties can voluntarily agree to alter them, share additional time and have Alex in their homes with the others present to demonstrate their cooperation and commitment to him, each of them is encouraged to seek opportunities for such cooperation and to secure mutual agreement to any changes in the schedule. So for example, having Tammy spend time with Alexander at the C. family home at Christmas, as has previously happened, is such an option. Further, there will be times where the previous plans or unexpected events will necessitate changes to the established schedule. The parties are encouraged to accommodate the changes each will from time to time require and to agree to make-up or switched times for contact with Alexander.
Barbara M. Quinn, Judge Child Protection Session
[2] Petitioner's Exhibit 4, Psychological Evaluation dated July 2, 1995.
[3] Petitioner's Exhibit 9 contains a written summary of each visit with detailed fact-specific behavioral observations. Exhibit 13 are the notes from which the typed summaries were prepared, as well as some of the parenting materials and the intake information secured by the Child and Family Agency.
[4] Petitioner's Exhibit 11, Psychological Evaluation — Updated dated 11/12/98.
CT Page 13710
[5] Respondents' exhibit B, is labeled "Maintaining Guardianship for Alexander C."
[6] Her father has kept a notebook of all of the various events, phone calls, missed visitations and changes in addresses Tammy has had. The notebook is voluminous and detailed and used for letters such as the one sent to Dr. Meier in 1997 to document Tammy's lapses. An equally accusatory letter was provided to DCF for its assessment.